WO

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Richard Lon Alter, | No.  CV-19-04387-PHX-DMF |
| Plaintiff, | |
| v. | **ORDER** |
| Commissioner of Social Security Administration, | |
| Defendant. | |

Plaintiff Richard Lon Alter ("Claimant") appeals the Commissioner of Social Security's decision to adopt the Administrative Law Judge's ("ALJ's") ruling denying his application for Disability Insurance Benefits under the Social Security Act.  Claimant filed a Complaint (Doc. 1) seeking judicial review of that denial, arguing that ALJ Kelly Walls erred by (1) rejecting his treating physician's assessments in favor of opinions from state agency reviewing consultants and from a physician who completed interrogatories at the ALJ's request, and (2) rejecting Claimant's symptom testimony without providing specific, clear, and convincing reasons supported by the record.  (Doc. 1 at 4-6)  The Court now addresses Claimant's Opening Brief (Doc. 15), Defendant's Response (Doc. 16), and Claimant's Reply (Doc. 19).

This Court has jurisdiction pursuant to 42 U.S.C. § 405(g) and with the parties' consent to Magistrate Judge jurisdiction pursuant to 28 U.S.C. § 636(c).  For the reasons set forth below, the Court will order vacating the Commissioner's final order and remanding for an award of benefits.

I.      BACKGROUND

A.      Application and Social Security Administration review

Claimant filed his application for disability insurance benefits in February 2013 at the age of 49, alleging a disability onset date of February 24, 2011.  (Doc. 15 at 2)  The state agency determined that Claimant was not disabled on initial review in August 2013 (Doc. 11-4 at 2-18) and again on reconsideration in June 2014.  (*Id.* at 20-36)  ALJ Kelly Walls conducted a hearing on Claimant's application on October 23, 2015 (Doc. 11-3 at 39-82) and issued a notice of unfavorable decision on February 18, 2016.  (*Id.* at 18-38) Claimant filed an appeal with the Appeals Council, which was denied by notice dated April 21, 2017.  (*Id*. at 2-7)  The Commissioner's decision subsequently became final.

Claimant filed a complaint seeking judicial review of the SSA denial.  (Doc. 11-11 at 29, No. CV-17-01887-PHX-DGC)   In response to Claimant's opening brief, the Commissioner conceded that the ALJ had erred in evaluating the opinions of Jerome Grove, M.D., and Claimant's symptom allegations.  (Doc. 11-11 at 47)  District Judge Campbell remanded for further administrative proceedings and the Appeals Council remanded Claimant's case to the ALJ for further evaluation of:  (1) Dr. Grove's opinions; (2) the consistency of Claimant's statements about his condition; and (3) Claimant's alleged failure to follow prescribed treatment.  (*Id*. at 40-42)  ALJ Walls issued a second unfavorable decision on September 28, 2018, without holding an additional hearing.  (Doc. 11-10 at 11-24)  Rejecting Claimant's written exceptions to the ALJ decision (Doc. 11-12 at 72-76), the Appeals Council adopted ALJ Walls' second decision as the final agency decision (Doc. 11-10 at 2-5).  Claimant again appeals to this Court.  (Doc. 1)

B.      Relevant medical treatment and imaging

1.      *Arizona Spine Care*

Claimant was seen at Arizona Spine Care on July 16, 2008, complaining of back, neck, and leg pain.  (Doc. 11-8 at 3-7)  Patient reported giving up his job due to arm and neck pain.  (*Id*. at 4)  James Hawkins, M.D., referred to a lumbar spine MRI from June 2008 that he stated showed degenerative disc disease at L3-L4, L4-L5, and L5-S1 as well

as a bulging disc and grade 1 spondylolisthesis at the latter.  (*Id.* at 7)  Dr. Hawkins noted some pain, numbness, and tenderness in Claimant's neck and diagnosed Claimant with lumbago, lumbar facet syndrome, and cervical spondylosis.  (*Id.*)

       2.    *Arizona Center for Pain Relief (AKA Pain Consultants of Arizona), Jerome Grove, M.D.*

Dr. Grove treated Claimant at this practice between February 2011 and August 2015.  (Doc. 11-8 at 33, 153, 175; Doc. 11-9 at 26)  Claimant initially presented with bilateral lumbar and hip pain, which Dr. Grove diagnosed as lumbar/lumbosacral disc degeneration and brachial neuritis. (Doc. 11-8 at 35-36)  At the time, Claimant was taking baclofen, Percocet, Norco (hydrocodone/acetaminophen), Robaxin, and Voltaren in tablet form.  (*Id.*)  In March of 2011, Claimant followed up with increased pain in his low back, neck, head, left arm, and left hip; Dr. Grove's notes indicate that Claimant "believes this [increased pain] is due to increased activity at work digging trenches." (*Id.* at 38)  Claimant displayed some tenderness in the neck, arms, low back, and left leg.  (*Id.* at 39-40)  Claimant continued to present with increased pain and tenderness and began to have trouble walking (*Id.* at 44, 47), and Dr. Grove subsequently prescribed Voltaren gel and Pennsaid solution.  (*Id.* at 45)

In May 2011, Claimant returned with swelling and tenderness in his left elbow with limited flexion and extension, later diagnosed as lateral epicondylitis.  (*Id.*)  Claimant continued to have pain radiating through his left arm, causing difficulty and worsened pain while picking up items.  (*Id.* at 47)  Between July 2011 and June 2013, Dr. Grove began a series of injections in Claimant's elbow joint, cervical spine, and between L4-L5, L5-S1, and S1-S2 of Claimant's lumbar spine. (*See, e.g., id.* at 50, 58-59)  Claimant reported some benefit after most injections but continued to have pain and tenderness.  (*See, e.g., id.* at 51, 60)  Claimant also claimed that although his pain had increased, his medications continued to "take the edge off[.]"  (*Id.* at 47)

In August 2011, Dr. Grove began to note that Claimant's gait was slow and shuffling.  (*Id.* at 55)  Due to increasing weakness and pain radiating into Claimant's left

leg, Dr. Grove ordered a lumbar MRI, which showed a small annular tear at L3-L4; a left disc extrusion at L4-L5; and spondylosis and grade 1 spondylolisthesis at L5-S1. (*Id.* at 61, 65)  By December 2011, Claimant reported that his daily functional ability had worsened to the point that he could not sit or walk without severe pain. (*Id.* at 63)  Dr. Grove noted Claimant's stooped posture, and a physical exam displayed that Claimant had moderately to severely impaired range of motion in his lumbar spine. (*Id.* at 64)  Dr. Grove found that causative factors of Claimant's pain included driving, rising from sitting, prolonged sitting, standing from sitting, and walking. (*Id.*)  Claimant was on Medrol, Robaxin, Norco, and Percocet at the time, and Dr. Grove additionally prescribed Zonegran (*Id.* at 65); in a March 2012 follow-up visit, however, Claimant reported that he never started Zonegran. (*Id.* at 69)

Claimant continued to follow up with Dr. Grove, reporting random onset of more severe pain and displaying some increased lumbar and cervical tenderness. (*See, e.g., id.* at 69-70, 75, 79)  Dr. Grove referred Claimant to a surgical consultation with Dr. William White at Barrow Neurosurgical Associates. (*Id.* at 77)  Claimant returned to Dr. Grove on July 2, 2012, complaining of increased cervical, lumbar, and right leg pain. (*Id.* at 79)  Claimant reported that he had begun taking increased pain meds. (*Id.*)  In addition to lumbar pain and decreased range of motion, Dr. Grove found moderate to severe cervical tenderness and pain radiating into the left arm while performing Spurling's Maneuver. (*Id.* at 80)  On July 30, 2012, Claimant returned after a fall that injured his lower back and right ankle and exhibited swelling in his right ankle and related trouble walking . (*Id.* at 82-83)  Since Claimant was expected to undergo a microdiscectomy the following week, Dr. Grove began prescribing Roxicodone for post-operative pain. (*Id.* at 84)

Following Claimant's microdiscectomy on August 1, 2012, Claimant reported no significant decrease in pain and displayed continued cervical and lumbar tenderness. (*Id.* at 85-86)  Dr. Grove diagnosed gout in Claimant's right toe and subsequently prescribed Indocin. (*Id.* at 87)  By October 23, 2012, Claimant began reporting slight functional improvement and decreased pain in his sciatic nerve, but also reported increased left elbow

and neck-related pain.  (*Id*. at 88)  Finding moderate cervical tenderness and bilateral radiating arm pain in response to Spurling's Maneuver, Dr. Grove continued Claimant's current range of pain relief medications but instructed Claimant to take hydrocodone for moderate pain and oxycodone for severe pain.  (*Id*. at 89-90)  When Claimant's reported pain and tenderness levels displayed no improvement, Dr. Grove continued altering medication levels throughout late 2012 and early 2013.  (*See, e.g., id*. at 94, 97)  On April 9, 2013, although Claimant reported low back, left elbow, right ankle, and right foot pain, Dr. Grove's notes stated that Claimant "report[ed] that his regimen allows him to work full-time."  (*Id*. at 99)

In August 2013, Claimant continued to complain of severe lumbar pain, radiating to both legs, and cervical pain with certain movements, as well as some leg cramps and muscle weakness.  (*Id*. at 177)  Claimant began displaying 4/5 reduced muscle strength in his right leg, with mild tenderness and decreased flexion in his neck and mild to moderate tenderness and impaired range of motion in his lumbar spine.  (*Id*. at 178-179)  Dr. Grove diagnosed Claimant with chronic lumbar radiculopathy and performed additional right elbow joint injections for Claimant's continuing lateral epicondylitis.  (*Id*.)  On November 22, 2013, Claimant reported that the elbow injections provided 70 percent relief and that his current combination of medications had caused decreased pain and increased range of motion, "allow[ing] him to work full time."  (*Id*. at 185)

Between August 2013 and October 2014, Claimant reportedly continued with a pain medication regimen of Robaxin, Norco, and Percocet (*Id*. at 179-198, Doc. 11-9 at 43-47), but reported on May 14, 2014 that this regimen had become ineffective.  (Doc. 11-8 at 196) Claimant also reported sleeping problems and increased pain after his daily living activities.  (*Id*.)  In response, Dr. Grove continued to alter medication levels and performed another left elbow injection.  (Doc. 11-9 at 47)

In January 2015, Claimant complained of lumbar pain radiating down both legs, neck pain radiating into his shoulders and left arm, and increased foot pain and gout flares, culminating in worsened function.  (*Id*. at 37)  Although physical exams displayed no

change in Claimant's tenderness, Dr. Grove restarted Claimant on Indocin and discontinued hydrocodone. (*Id.* at 39)  Claimant reported temporarily improved function in February 2015 (*Id.* at 33), but by May 2015, Claimant's pain reportedly increased with increased activity, spurring Dr. Grove to once again alter Claimant's medication levels. (*Id.* at 29-31)

3.    *Barrow Neurosurgical Associates, William White, M.D.*

In May 2012, Claimant visited Dr. White, a neurosurgeon, to discuss surgical treatment options due to his leg, neck, and chronic back pain.  (Doc. 11-8 at 29-32)  Dr. White noted that one of Claimant's previous lumbar MRIs showed grade 1 spondylolisthesis at L5-S1, a herniated disc at L4-L5, and a disc tear at L3-L4.  (*Id.* at 31)  Dr. White also took note of Claimant's narcotics dependence in light of Claimant's daily narcotics treatment during the previous ten years.   (*Id.*)   Claimant approved a microdiscectomy on L4-L5, which Dr. White performed at St. Joseph's Hospital and Medical Center on August 1, 2012.  (Doc. 11-9 at 18-20)  During surgery, lumbar fluoroscopy was performed; the report writer opined that the images showed mild anterolisthesis and degenerative changes at L5-S1 as well as a narrowed disc at L4-L5.  (*Id.* at 21)  Claimant was discharged from the hospital with full bilateral motor strength on August 2, 2012.  (*Id.* at 9)  At Claimant's post-operative visit with Dr. White on August 16, 2012, Claimant was able to walk, occasionally utilizing a crutch, but reported "real bad" pain when lying down.  (Doc. 11-8 at 28)  Claimant remained on hydrocodone and oxycodone for post-operative pain, but Dr. White recommended tapering off the narcotics. (*Id.*)

4.    *Norterra Family Medicine*

Claimant was seen at this practice between March 2012 and September 2015.  (Doc. 11-8 at 108, 167; Doc. 11-9 at 26)  At each visit, Claimant reported that he was taking some combination of lisinopril, hydrocodone/acetaminophen, methocarbamol, and oxycodone.  (*Id.*)  Claimant initially reported multiple issues, most notably fatigue, trouble sleeping, chronic pain, and skin nodules.  (Doc. 11-8 at 132)  Claimant was diagnosed with

hypertension, hypercholesterolemia, fatigue, B12 deficiency, and male hypogonadism. (*Id*. at 130, 134)  For the latter two diagnoses, Mollyann Allen, P.A., prescribed Nascobal and Axiron, respectively.  (*Id*. at 126, 130)  In February 2015, Claimant reportedly could not afford treatment for his hypertension or chronic back pain, and Ms. Allen noted that Claimant presented as unkempt.  (*Id*. at 206)  Claimant reported that he could not work due to chronic back pain and that his severe pain had diminished his quality of life.  (*Id.*)  Allen re-prescribed lisinopril for Claimant's hypertension.  (*Id*. at 208)

### 5. *Imaging*

Cervical and lumbar MRIs were performed in April and August of 2006, respectively, in response to Claimant's complaints of neck and lower back pain.  (Doc. 11-8 at 14-17)  The cervical MRI displayed mild degeneration between C3-C7 as well as mild disc protrusion at C6-C7.  (*Id*. at 16-17)  The lumbar MRI displayed small disc protrusions and mild canal stenosis at L3-L5 as well as grade 1 anterolisthesis at L5-S1.  (*Id*. at 14-15)

On July 18, 2008, Claimant underwent another cervical MRI for neck pain radiating into his shoulders and arms.  (*Id*. at 8-10)  The images showed moderate degenerative disc disease and mild foraminal narrowing at C6-C7.  (*Id*.)

On October 2, 2008, Claimant obtained cervical spine and lumbosacral X-rays.  (*Id*. at 231-232)  The former showed mild to moderate disc space narrowing at C6-C7, which the report writer opined was likely cervical spondylosis.  (*Id*. at 231)  The latter displayed degenerative changes at L5-S1, which the report writer remarked were likely spondylolysis with grade 1 spondylolisthesis.  (*Id*. at 232)

Claimant additionally obtained a left elbow X-ray on May 31, 2011; the report writer noted no fractures or subluxations but opined that the image appeared consistent with lateral epicondylosis.  (*Id*. at 103-105)

On December 15, 2011, Claimant underwent a lumbar MRI, which displayed a small annular tear disc protrusion with moderate central canal narrowing at L3-L4; a small disc extrusion at L4-L5; and bilateral spondylolysis and grade 1 spondylolisthesis with bilateral foraminal narrowing at L5-S1.  (*Id*. at 11-13)

1

C.     **Medical source statements**

2

1.     *Jerome Grove, M.D.*

3   Dr. Grove, Claimant's treating pain specialist from 2011 to 2015, submitted an

4   initial evaluation of Claimant's work capability in April and May 2014. (Doc. 11-8 at 201-

5   205) Based on scans and monthly physical exams, Dr. Grove opined that due to Claimant's

6   chronic pain and medications, Claimant's capacity for work was limited. (*Id*. at 203)

7   Specifically, Dr. Grove opined that Claimant could occasionally lift and carry less than ten

8   pounds but could never frequently lift and carry. (*Id*. at 201)  In an eight-hour day,

9   Claimant could stand and/or walk with normal breaks for less than two hours and could sit

10  with breaks for less than two hours; Claimant would need to alternate sitting and standing

11  every two hours and would need to walk every thirty minutes for at least five minutes. (*Id*.)

12  Claimant could never climb but may occasionally stoop, kneel, crouch, or crawl. (*Id*. at

13  202) Dr. Grove categorized Claimant's pain as severe, which would frequently interfere

14  with attention and concentration. (*Id*. at 204-205)

15      Dr. Grove submitted an updated evaluation in October 2015. (*Id*. at 235-239)  Dr.

16  Grove described Claimant as having "chronic severe pain that requires medication

17  management" and based his findings on physical exams and scans. (*Id*. at 237)  Claimant

18  would be able to occasionally or frequently lift and carry ten pounds. (*Id*. at 235)  In an

19  eight-hour day, Claimant could stand and/or walk with breaks for less than two hours and

20  could sit with breaks for less than two hours; Claimant would need to alternate sitting and

21  standing every two hours. (*Id*.)  Claimant could never climb, kneel, crouch, or crawl but

22  may occasionally balance or stoop. (*Id*. at 236)  Dr. Grove again categorized Claimant's

23  pain as severe enough to frequently interfere with attention and concentration. (*Id*. at 238-

24  239)  Dr. Grove stated that these limitations existed before September 30, 2015. (*Id*. at

25  237)

26      D.     **Examining consultant evaluations**

27          1.     *Greg A. Peetoom, Ph.D.*

28  Dr. Greg A. Peetoom, Ph.D., conducted a psychological evaluation of Claimant on

July 30, 2013.  (Doc. 11-8 at 160-164)  Claimant reported that he had given up work three years earlier and could not continue part-time landscaping work.  (*Id*. at 162)  Claimant also reported use of hydrocodone, poor sleep and fatigue, and some depression; Dr. Peetoom affirmed that Claimant was slightly depressed with slightly constricted affect.  (*Id*.)  Claimant stated that he could "socialize except around large noisy groups" and could "complete tasks until pain interferes[.]"  (*Id*.)  Noting that Claimant could perform tasks such as driving, cooking, attending church, and contacting friends, Dr. Peetoom concluded that Claimant presented as depressed but could still interact appropriately and complete normal daily tasks.  (*Id*. at 163-164)

Dr. Peetoom also noted some problems with attention and concentration (*Id*. at 164) but concluded that Claimant could process and remember most instructions.  (*Id*. at 165) Outside of large, loud settings, Claimant could interact well.  (*Id*. at 166)

E.    **Non-examining medical interrogatory**

1.    *Eric D. Schmitter, M.D.*

Eric D. Schmitter, M.D., an orthopedic surgeon, submitted a medical interrogatory in November 2015 regarding Claimant's physical impairments.  (Doc. 11-9 55-57)  Dr. Schmitter based his opinions on medical records provided to him.  (*Id*. at 55)  Based on his assessment of the medical records, Dr. Schmitter identified untreated grade 1 spondylolisthesis of L5-S1 and a minor disc bulge at L4-L5; Dr. Schmitter opined that the L4-L5 disc was not herniated and was unnecessarily operated on without benefit.  (*Id*.)  Dr. Schmitter concluded that Claimant's chronic lumbar pain without neurologic deficit did not meet or equal any SSA listing of impairment.  (*Id*. at 56)  Dr. Schmitter believed that Claimant could carry or lift ten pounds frequently and up to twenty pounds occasionally.  (*Id*.)  In an eight-hour day, Claimant could stand and walk four hours or sit eight hours with breaks.  (*Id*.)  Dr. Schmitter further recommended that Claimant see an orthopedic spine surgeon to discuss an L5-S1 fusion.  (*Id*.)

F.    **State agency evaluations**

1.    *David Yandell, Ph.D. and Jean Goerss, M.D.*

1    During the initial state agency determination in August 2013, non-examining

2    consultative reviewer David Yandell, Ph.D., stated that Claimant's mental impairments

3    were not severe.  (Doc. 11-4 at 8)  Jean Goerss, M.D., concluded that because Dr. Grove

4    had described Claimant's gait as shuffling but the psychological consultant had described

5    a normal gait on a later date, insufficient evidence existed to conclude that Claimant's

6    condition was worsening.  (*Id.* at 10-11)  Dr. Goerss opined that Claimant could frequently

7    lift or carry twenty pounds and occasionally could lift or carry up to twenty-five pounds.

8    (*Id.* at 14)  Dr. Goerss also believed that Claimant could stand, walk, or sit for six hours

9    each in an eight-hour day, with certain postural limitations.  (*Id.*)

10                  *2      Rosalia Pereyra, Psy.D. and Ernest Griffith, M.D.*

11    During the state agency's reconsideration in June 2014, Rosalia Pereyra, Psy.D.,

12    affirmed Dr. Yandell's conclusion that Claimant's mental impairments were not severe.

13    (Doc. 11-4 at 30)  Ernest Griffith, M.D., concluded that the severe restrictions offered by

14    Dr. Grove, which were "less than sedentary level and incompatable [*sic*] with full time

15    work[,]" were not in accord with the medical evidence provided.  (*Id.* at 28)  Dr. Griffith

16    opined that Claimant could lift or carry ten pounds frequently and up to twenty pounds

17    occasionally.  (*Id.* at 31)  Dr. Griffith believed that in an eight-hour day, Claimant could

18    stand or walk for four hours and could sit for six hours with postural limitations.  (*Id.* at

19    31-32)

20    **II.      STANDARD OF REVIEW**

21    Under 42 U.S.C. § 405(g), this court must affirm the Commissioner's decision to

22    adopt the ALJ's findings if her findings are supported by substantial evidence and are free

23    from reversible error.  *Orn v. Astrue*, 495 F.3d 625, 630 (9th Cir. 2007).  "Substantial

24    evidence is more than a mere scintilla, but less than a preponderance."  *Tidwell v. Apfel*,

25    161 F.3d 599, 601 (9th Cir. 1998).  "It is 'such relevant evidence as a reasonable mind might

26    accept as adequate to support a conclusion.'"  *Richardson v. Perales*, 402 U.S. 389, 401

27    (1971) (quoting *Consolidated Edison v. NLRB*, 305 U.S. 197, 229 (1938)).  The court

28    reviews "only the reasons provided by the ALJ in the disability determination and may not

affirm the ALJ on a ground upon which he did not rely." *Garrison v. Colvin*, 759 F.3d 995, 1010 (9th Cir. 2014).

In determining whether substantial evidence supports the ALJ's decision, the court considers the whole record, weighing both the evidence that supports and that which detracts from the ALJ's conclusions. *Reddick v. Chater*, 157 F.3d 715, 720 (9th Cir. 1998). The ALJ is responsible for resolving conflicts in medical testimony, ambiguity in the record, and determining credibility. *Andrews v. Shalala*, 53 F.3d 1035, 1039 (9th Cir. 1995). If there is sufficient evidence to support the ALJ's outcome, the Court cannot substitute its own determination. *See Young v. Sullivan*, 911 F.2d 180, 184 (9th Cir. 1990). Although the Court "must do more than merely rubberstamp the ALJ's decision[,]" *Winans v. Bowen*, 853 F.2d 643, 645 (9th Cir. 1988), where the evidence is susceptible to more than one rational interpretation, the ALJ's decision must be upheld. *Magallanes v. Bowen*, 881 F.2d 747, 750 (9th Cir. 1989) (citations omitted).

## III.   LEGAL STANDARDS

Claimant bears the burden of proving disability under the Social Security Act. *Tidwell v. Apfel*, 161 F.3d at 601. He meets this burden if he can establish that he has a physical or mental impairment that prevents him from engaging in any substantial gainful activity and which is expected to result in death or to last for a continuous period of at least one year. 42 U.S.C. §§ 423(d)(1) and 1382c(a)(3)(A). Claimant's impairments must be such that he is not only unable to perform his past relevant work, but he cannot, considering his age, education and work experience, engage in other substantial gainful work existing in the national economy. *Id.* at §§ 423(d)(2) and 1382c (a)(3)(B).

The Commissioner applies a five-step sequential process to evaluate disability. 20 C.F.R. §§ 404.1520 and 416.920. In the first three steps, the Commissioner determines: (1) whether a claimant has engaged in substantial gainful activity since the alleged onset; (2) whether he has a "severe" impairment or a combination of impairments that is "severe"; and (3) whether the severity of any impairment meets or equals the severity of any impairment in the Listing of Impairments (20 C.F.R. Pt. 404, Subpt. P, App. 1). *Id.* If a

1   claimant complies with these three steps, he will automatically be found disabled; if the

2   claimant satisfies steps one and two but not three, he must then satisfy step four.  *Id.*

3       Before considering step four, the ALJ must assess the claimant's residual functional

4   capacity ("RFC"), *see* 20 C.F.R. § 404.1520(a)(4)(iv), which is "the most [the claimant]

5   can still do despite [the claimant's] limitations." *Treichler v. Comm'r of Soc. Sec. Admin.*,

6   775 F.3d 1090, 1097 (9th Cir. 2014) (quoting 20 C.F.R. § 404.1545(a)(1)).  The RFC

7   assessment is "based on all the relevant medical and other evidence" in the claimant's

8   record. *Id.* (quoting 20 C.F.R. § 404.1520(e)).  In determining a claimant's RFC, the ALJ

9   must consider all of a claimant's medically determinable impairments, including those that

10  are not severe.  20 C.F.R. § 404.1545(a)(2).

11      At step four, the ALJ considers the claimant's RFC and past relevant work.  20

12  C.F.R. § 404.1520(a)(4)(iv).  If a claimant can perform his past relevant work, he is not

13  found to be disabled.  *Id.*

14      When a claimant satisfies step four, the burden shifts from him to the Commissioner

15  to establish the claimant is able to perform work in the national economy. *Tackett v. Apfel*,

16  180 F.3d 1094, 1098 (9th Cir. 1999) (claimant bears the burden of proof on the first four

17  steps, but the burden shifts to the Commissioner at step five).  The fifth and final step

18  involves the ALJ's decision whether a claimant can make an adjustment to other work,

19  given the ALJ's assessment of the claimant's RFC and age, education and work experience.

20  20 C.F.R. § 404.1520(a)(4)(v).

21  **IV.    THE ADMINISTRATIVE HEARING**

22      The ALJ conducted a hearing on Claimant's application on October 23, 2015.  (Doc.

23  11-3 at 41-83)  Claimant's counsel argued in an opening statement that if the ALJ's

24  decision reached Step 5 in the sequential analysis, the medical record would support a

25  finding that Claimant was capable of performing "less than sedentary" activities.  (*Id.* at

26  43-44)  On questioning by the ALJ, Claimant reported that he was able to drive and had

27  completed 12 years of schooling but did not graduate from high school.  (*Id.* at 45-47)

28  Claimant reported he had worked for landscaping/irrigation companies in counter sales and

installation and maintenance of irrigation systems.  (*Id.* at 47-49)  Claimant explained that at a certain point, he was unable to work full time and was allowed to work part time, but eventually was laid off.  (*Id.* at 50)  Claimant stated he was unable to maintain any full-time employment because he had good days and bad days and he would be unable to keep any kind of schedule since he could not work on the bad days.  (*Id.* at 51)

Describing his back pain, Claimant said he suffered a constant dull ache in his low back that spread to his hips and made it hard to walk.  (*Id.* at 52)  He also said that cramping back pain radiated to the sides of his back, and that he also suffered pain along his sciatic nerve in the back of his leg to his foot.  (*Id.*)  Claimant reported the pain was made better with pain medication and additionally sometimes with hot pads, hot showers, and walking.  (*Id.* at 52)  He explained that the pain was made worse with walking for long periods, sitting, sleeping, cold weather, and stress.  (*Id.* at 52-53)  Claimant stated that his pain at the time of the hearing was about a 4 out of 10, which was a little higher than normal.  (*Id.*)

When asked about his neck pain, Claimant described a constant pain on the left side of his neck up to his skull and down to the top of his shoulder that caused continuous tightness.  (*Id.* at 53)  At its worse, Claimant said the pain traveled through the top of his head to the left side of his head into his eye and sometimes caused dizziness.  (*Id.*)  Additionally, Claimant testified that the neck pain resulted in nerve pain down through his arm to his fingers, causing a pins and needles sensation and burning.  (*Id.*)  Claimant said that working with his hands, cooking, cleaning, and lifting worsened the pain, and that "[n]ot a whole lot helps my neck pain."  (*Id.* at 54)  He rated his neck pain at the time of the hearing as a 3 out of 10, which he said was "pretty typical, every day."  (*Id.*)

Describing his history of left elbow pain, Claimant said he had recurring issues with a tendon in his elbow but was also suffering a new pain that he thought may have been caused by gout.  (*Id.* at 54-55)  He stated that in the past he obtained relief from his tendon pain through injections, and that the pain could "go all the way to ten."  (*Id.* at 55-56)

Claimant told the ALJ that a microdiscectomy in 2012 only helped his back pain "a little bit."  (*Id.* at 57)  He also reported he had stopped getting injections to his back because

they weren't helping him anymore, and that he was still receiving injections in his neck, although he said the neck injections didn't help "a whole lot." (*Id.* at 57-58)

Claimant reported he had obtained physical therapy for his low back pain "way back," and a short time later also for his neck "in maybe 2006, 2007." (*Id.* at 59)

Claimant said he could walk for "30, 45 minutes" at a time before he needed to rest, but that he could only stand for 10 to 15 minutes before having to sit down, and only if he were allowed to rock back and forth. (*Id.* at 60) Claimant reported he could sit at one time for about 30 to 45 minutes at a time, depending on "the chair [and] the situation." (*Id.* at 61) He said he could only lift up to 5 pounds. (*Id.*) He complained of pain in his left arm when reaching over his head. (*Id.*) Claimant stated he experienced pain when bending at the waist, kneeling on the ground, squatting down, and crawling. (*Id.* at 62-63)

Claimant declared he had some short-term memory loss and that he had trouble concentrating when there is "fast speech" and a lot of noise around. (*Id.* at 63-64) He explained he did not sleep at night for more than 4 or 5 hours at a time. (*Id.* at 66) Claimant said he did well with light house cleaning he could perform standing up, such as washing dishes, taking out the garbage, and sweeping floors, as long as he did not have to bend or stoop. (*Id.* at 66) However, Claimant stated that he would need to sit down after working around the house for 15 or 20 minutes. (*Id.*) He complained he had trouble in the shower washing his feet. (*Id.* at 67) Claimant said he was able to do his shopping alone, but had trouble picking up "bigger items" such as water cases. (*Id.* at 67) He testified he went to church meetings for an hour and forty-five minutes but had to leave because of pain and missed some meetings, especially during the cooler months. (*Id.* at 68) Claimant reported being able to fish on a pontoon boat at night, and to play his guitar while sitting for 10 to 15 minutes at a time. (*Id.* at 70-71)

On questioning from his attorney, Claimant reported he suffered 2 to 3 bad days a week in cooler weather and 1 to 2 bad days a week in hotter weather. (*Id.* at 72-73) He explained that on bad days he spent most of the day in his recliner. (*Id.* at 72) Claimant explained that he used his recliner so that he could change positions from sitting up to lying

back and switch from side to side to address his "excruciating pain." (*Id.*) Claimant confirmed that he could not work on a regular basis because he had no control over his bad days. (*Id.* at 73)

The ALJ posed hypothetical employment situations to the Vocational Expert, assuming a hypothetical individual having the same age, education, and work experience as Claimant. (*Id.* at 76)  In the first hypothetical, the ALJ asked the VE to assume the individual could perform work at the light level except he could stand and/or walk for 4 hours during an 8-hour workday; sit for 6 hours in an 8-hour work day; frequently climb ramps and stairs; never climb ladders, ropes, and scaffolds; occasionally stoop, kneel, crouch, and crawl; occasionally reach overhead with his left arm; must avoid concentrated exposure to extreme cold, wetness, humidity, vibration, and hazards including moving machinery and unprotected heights; and due to the side effects of prescription narcotic pain medication would be able to perform simple routine tasks. (*Id.*)  The VE stated that such an individual could not perform any of Claimant's past relevant jobs but would be capable of performing light exertion positions such as storage rental facility clerk, router, and ticket seller. (*Id.* at 76-77)

The ALJ then altered the hypothetical to require that the individual be allowed to alternate positions between sitting and standing for 5 minutes every 30 minutes. (*Id.* at 77)  The VE opined that the three representative jobs he had identified allowed for such a sit/stand option. (*Id.*)

Next, the ALJ inquired about altering the second hypothetical to provide for a sedentary level.  The VE said this individual would be able to perform the jobs of call out operator and parking lot cashier. (*Id.*)

Claimant's counsel asked the VE to assume a hypothetical individual of Claimant's age, education, and past relevant work, who would: occasionally lift and/or carry less than 10 pounds; stand and/or walk with normal breaks for less than 2 hours in an 8-hour day; sit with normal breaks for less than 6 hours in an 8-hour workday; require the ability to alternate standing and/or sitting at least every 2 hours and to walk around for 5 minutes

every 30 minutes; never climb; never-to-occasionally stoop, kneel, crouch, and crawl; frequently-to-occasionally handle or feel; and occasionally perform fine manipulation or reach.  (*Id.* at 78-79)  The VE explained that such an individual could not perform either Claimant's past relevant work or any other work because of limitations requiring less than full-time hours.  (*Id.* at 79)  Claimant's counsel advised the ALJ he would not be asking the VE questions based on Claimant's pain assessments because the assessments "were work preclusive on their face."  (*Id.*)

Claimant's counsel next posed a hypothetical in which the individual would: frequently lift and/or carry 10 pounds; stand and/or walk less than 2 hours in an 8-hour workday; sit less than 2 hours in an 8-hour workday; never climb, kneel, crouch, or crawl; occasionally balance or stoop; occasionally reach; frequently handle fine manipulation and feel; and never work at unprotected heights, around moving machinery, or in temperature extremes.  (*Id.* at 79-80)  The VE stated that this individual would not be capable of performing Claimant's past relevant work or any other work, again because of limitations to less than full-time hours.  (*Id.* at 80)

Claimant's counsel then posed a hypothetical in which the individual would encounter 2 to 3 "bad days" per week during cooler weather months and 1 to 2 "bad days" per week in hotter weather months, with "bad days" meaning the individual would be off-task 33% of a workday due to pain, irritability, and increased problems concentrating.  (*Id.*)  The VE testified there would be no available work under those circumstances.  (*Id.* at 81)

Finally, Claimant's counsel inquired whether, with Claimant's past relevant work, there would be transferrable skills to the sedentary work level.  (*Id.*)  The VE said there would be transferable skills regarding the sales clerk position, but if the individual were limited to unskilled work they would not be able to do the job.  (*Id.*)

The ALJ indicated to Claimant and his counsel that she would send Claimant's medical records out for review by an orthopedic medical expert for an opinion about whether Claimant's limitations met or equalled "some of the guidelines that we have,

1    because your case is very close on some of these and I'd like to have another opinion on

2    it." (*Id.* at 81-82)

3    **V.    THE ALJ's DECISION**

4    　　　The ALJ issued her unfavorable decision on September 28, 2018.  (Doc. 11-10 at 8-

5    24)  The ALJ found that she did not need to offer Claimant another hearing where "the

6    period at issue had expired before the date of the initial hearing decision" and in light of

7    "the facts of this case" and "the issues directed for consideration on remand."  (*Id.* at 11)

8    The ALJ set forth the issues the Appeals Council directed for consideration on remand by

9    this Court, requiring the ALJ to:

10   　　　　　(1) further evaluate the claimant's alleged symptoms and provide rationale
11   　　　　　in accordance with the disability regulations pertaining to evaluation of
12   　　　　　symptoms (20 C.F.R. 404.1529);

13   　　　　　(2) give further consideration to the claimant's maximum residual functional
14   　　　　　capacity during the entire period at issue, provide rationale with specific
15   　　　　　references to evidence of record in support of the assessed limitations (SSR
     　　　　　96-8p), evaluate the treating source opinions in accordance with 20 C.F.R.
16   　　　　　404.1527, and explain the weight given to opinion evidence; [and]

17   　　　　　(3) if warranted, obtain supplemental evidence from a vocational expert to
18   　　　　　clarify the effect of the assessed limitations on the claimant's occupational
     　　　　　base (SSR 83-14).

19   (*Id.* at 11-12)  The ALJ concluded that additional VE testimony was "not warranted." (*Id.*

20   at 12)  The ALJ noted that Claimant's alleged onset of disability date was February 24,

21   2011, and his date last insured was September 30, 2015.  (*Id.* at 11-12)  She concluded that

22   Claimant was not disabled from February 24, 2011 through September 30, 2015.  (*Id.*at 12)

23   　　　The ALJ found that Claimant had not engaged in substantial gainful activity

24   between his alleged onset of disability and his date last insured.  (*Id.* at 14)  She stated that

25   through the date last insured, Claimant suffered from the severe impairments of cervical

26   and lumbar degenerative disc disease and spondylosis, status post microdiscectomy at the

27   L4-5 level, and epicondylosis of the left elbow.  (*Id.*)  The ALJ also concluded Claimant

28   had been treated for the non-severe conditions of hyperlipidemia, hypertension,

hypogonadism, gout, and depression. (*Id.* at 14-16)  The ALJ further found that Claimant did not have an impairment or combination of impairments meeting or medically equaling the severity of a listed impairment as defined in 20 C.F.R. Part 404, Subpart P, Appendix 1. (*Id.* at 16)

The ALJ concluded that Claimant retained the RFC to perform:

> light work as defined in 20 CFR 404.1567(b) except that he could have sat for about six hours out of an eight-hour work day and stood and/or walked for only about four hours out of an eight-hour workday. Additionally, the claimant must have had the opportunity to alternate position between sitting and standing every 30 minutes for five minutes. He could have frequently climbed ramps and stairs, but could never have climbed ladders, ropes, or scaffolds. He was able to occasionally stoop, kneel, crouch, crawl, and reach overhead with the left upper extremity. He was to have avoided extreme cold, wetness, humidity, vibration, and hazards, including moving machinery and unprotected heights. Due to the effects of narcotic pain medication, he was able to perform only simple, routine tasks.

(*Id.* at 17)

The ALJ stated that while the medical evidence supported the conclusion that Claimant's impairments "could reasonably be expected to cause the alleged symptoms[,]" Claimant's "statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record[.]" (*Id.* at 18)  The ALJ found that Claimant was not able to perform his past relevant work. (*Id.* at 22)  However, the ALJ found there were jobs existing in significant numbers in the national economy that Claimant could have performed, including the representative unskilled occupations at the light exertional level of storage facility rental clerk, router, and ticket seller. (*Id.* at 23)  Accordingly, the ALJ held that Claimant had not been under a disability as defined in the Social Security Act from his alleged onset date of February 24, 2011, through the date last insured, September 30, 2015. (*Id.*)

## VI.   DISCUSSION

Claimant argues the ALJ erred by:  (1) rejecting the opinions of Claimant's treating physician, Dr. Grove, in favor of opinions offered by the reviewing state agency physicians

1   and of orthopedic surgeon Dr. Eric Schmitter, the orthopedic surgeon who completed

2   interrogatories based on Claimant's medical records following the 2015 hearing; and (2)

3   by rejecting Claimant's symptom testimony "in the absence of specific, clear and

4   convincing reasons supported by substantial evidence in [the] record as a whole."  (Doc.

5   15 at 1-2)  Each argument is addressed in turn.

6        **A.    The ALJ erred by rejecting the opinions of treating physician Jerome**

7   **Grove, M.D.**

8        The ALJ accorded "partial weight" to the opinions of Claimant's treating physician,

9   Dr. Grove.  (Doc. 11-10 at 21)  The ALJ found that Dr. Grove's opinion that Claimant

10   would be limited to sitting and standing for 2 hours in an 8-hour workday was not supported

11   by the doctor's own treatment notes, which documented Claimant's "relatively positive

12   response to treatment for his cervical and lumbar spine," his successful treatment for

13   epicondylosis, his "largely normal upper and lower extremity strength and sensation," and

14   his ability to walk without the need for any assistive device.  (Id.)  The ALJ also identified

15   Dr. Grove's notes indicating that treatment had resulted in "increased activity levels,"

16   "increased function and decreased pain," and Claimant's scattered reports of being able to

17   work full time.[1]  (Id.)  The ALJ declared, however, that Dr. Grove's opinion that Claimant

18   would need to alternate between sitting and standing was "consistent with [Claimant's]

19   continued reports of ongoing pain with prolonged sitting and standing[.]"  (Id.)  The ALJ

20   further found that "[Claimant's] frequently slow and shuffling gait" supported a limitation

21   of standing and walking for 4 hours in an 8-hour workday.  (Id.)  Although the ALJ

22   concluded that Claimant's pain symptoms did not warrant "significant functional

23   limitations," she found that Claimant would be limited to performing only simple, routine

24

25   [1] Dr. Grove's treatment notes for Claimant's appointments on February 11, 2013, April 16,
    2013, November 22, 2013, March 18, 2014, and October 30, 2014 included language
26   indicating that Claimant reported his medication regimen allowed him to work full-time
    (Doc. 11-8 at 97, 101, 187, Doc. 11-9 at 43), or allowed him to perform his activities of
27   daily living (Id. at 194).  Upon questioning about these treatment notes by the ALJ,
    Claimant stated that he had not been able to work full-time and that he must have been
28   referring to "cleaning [his] house or doing work around [his] house."  (Doc. 11-3 at 15)

tasks due instead to the effects of narcotic pain medication.  (*Id.* at 17, 21)

The ALJ accorded "some weight" to the opinion of Dr. Schmitter, the orthopedic surgeon who provided answers to a medical interrogatory of Claimant's physical impairments after the hearing.  (*Id.* at 20, Doc. 11-9 at 55-57)  The ALJ endorsed as consistent with the record Dr. Schmitter's opinions that Claimant could lift 20 pounds occasionally and lift 10 pounds frequently and could stand and/or walk for 4 hours in an 8-hour workday.  (Doc. 11-10 at 20)  Similarly, the ALJ gave "some weight" to the opinions of Ernest Griffith, M.D., the state agency medical consultant who reviewed the record on reconsideration.  (*Id.*)  Dr. Griffith opined that Claimant was able to stand and/or walk for a total of 4 hours in an 8-hour workday, sit for a total of about 6 hours in an 8-hour workday, and lift and/or carry 10 pounds frequently and 20 pounds occasionally.  (Doc. 11-4 at 31-32)  The ALJ noted regarding both Dr. Schmitter's and Dr. Griffith's opinions that additional limitations were required based on Claimant's pain testimony.  (Doc. 11-10 at 20)  The ALJ identified as an additional limitation the need to alternate between sitting and standing or walking.  (*Id.*)

Claimant argues the ALJ erred by deciding "on her own that the record contained findings that would justify rejection of the treating physician's opinion."  (Doc. 15 at 18)  He next contends that when a claimant reports some improvement after surgery or treatment procedures, this does not "equate to the ability to perform competitive employment."  (*Id.* at 19)  Claimant also asserts the ALJ erred by failing to reconcile evidence of Claimant's "normal strength and sensation and the absence of an assistive device at single time-limited appointments with [Claimant's] functioning over an eight-hour workday."  (*Id.* at 20 (emphasis omitted))  Claimant declares that because he testified he could not work because of pain, evidence of his strength and sensation or that he could walk without an assistive device has nothing to do with his ability "to sustain work-related tasks over an eight-hour workday."  (*Id.*)  Claimant maintains that the ALJ erred by not explaining how the evidence she relied on contradicted Dr. Grove's assessment of Claimant's ability to work.  (*Id.* at 21)

The ALJ is required to evaluate every medical opinion he receives.  20 C.F.R.§ 404.1527(b).  In determining how much deference to give a physician's medical opinion, the Ninth Circuit distinguishes between the opinions of treating physicians, examining physicians, and non-examining physicians.  *See Lester v. Chater*, 81 F.3d 821, 830 (9th Cir. 1995)).  Generally, an ALJ should give the greatest weight to a treating physician's opinion and more weight to the opinion of an examining physician than a non-examining physician.  *See Andrews v. Shalala*, 53 F.3d 1035, 1040-41 (9th Cir. 1995); *see also* 20 C.F.R. § 404.1527(c)(1)-(6) (listing factors to be considered when evaluating opinion evidence, including length of examining or treating relationship, frequency of examination, consistency with the record, and support from objective evidence).  However, an ALJ "'need not accept the opinion of any physician, including a treating physician, if that opinion is . . . inadequately supported by clinical findings.'"  *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009) (quoting *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)).  "If a treating or examining doctor's opinion is contradicted by another doctor's opinion, an ALJ may only reject it by providing specific and legitimate reasons that are supported by substantial evidence."  *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005) (citing *Lester*, 81 F.3d at 830-31).  To meet this requirement, the ALJ must provide "a detailed and thorough summary of the facts and conflicting clinical evidence, stating his interpretation thereof, and making findings."  *Cotton v. Bowen*, 799 F.2d 1403, 1408 (9th Cir. 1986).  "The ALJ must do more than offer his conclusions.  He must set forth his own interpretations and explain why they, rather than the doctors', are correct."  *Embrey v. Bowen*, 849 F.2d 418, 421-22 (9th Cir. 1988).

The Court disagrees with Claimant's first argument that the ALJ decided "on her own that the record contained findings that would justify rejection of the treating physician's opinion."  (Doc. 15 at 18)  Instead, it appears the ALJ weighed the opinions of treating physician Dr. Grove and the various examining and non-examining medical professionals in the record, 20 C.F.R. § 404.1527.  (Doc. 11-10 at 20-21)  The ALJ accorded "some weight" to the opinions of medical expert Dr. Schmitter and Dr. Griffith.  (Doc. 11-10 at

20)   The ALJ stated that Dr. Schmitter's opinions were "supported" by his review of Claimant's entire medical record, his specialization in orthopedic surgery, and his familiarity with the Social Security disability program.  (Doc. 11-10 at 20)  The ALJ found Dr. Schmitter's opinions were additionally supported by evidence including Claimant's "generally positive response to injection and medication therapy, his largely intact sensation and strength, and his ability to ambulate without an assistive device."  (*Id.*)  The ALJ stated that Dr. Griffith's opinions found support in the same medical evidence she identified for Dr. Schmitter's opinions as well as Dr. Griffith's review of the record and his familiarity with the Social Security disability program.  (*Id.*)  The ALJ only accorded "partial weight" to Dr. Grove's opinions, again citing evidence regarding Claimant's positive response to treatment, his sensation and strength, and his ability to walk.  (*Id.* at 21)

The Court finds, however, that the ALJ failed to make the necessary connection between:   (1) Dr. Grove's treatment notes stating that Claimant experienced some improvement after treatment procedures, did not use an assistive device to walk, and exhibited full or near full strength and sensation in his extremities, on the one hand; and (2) the ALJ's conclusion that Claimant was able to perform full-time light work consistent with the limitations in the RFC the ALJ identified, on the other hand.  *See Johnson v. Comm'r of Soc. Sec. Admin.*, No. CV-18-01230-PHX-DGC, 2019 WL 429887 at \*4 (D. Ariz. Feb. 4, 2019) (holding that the ALJ had failed to "'set forth [his] own interpretations and explain why they, rather than the doctors', are correct.'  *Garrison*, 759 F.3d at 1012" and citing *Scott v. Astrue*, 647 F.3d 734, 740 (7th Cir. 2011) ("the ALJ must build a 'logical bridge' between the evidence and her conclusion")).  The ALJ failed to provide the nexus between the evidence she cited and the conclusions she drew from that evidence or to explain why her interpretations rather than those of Dr. Grove were correct.  Similarly, the ALJ did not explain how Dr. Grove's notes indicating that Claimant's treatment had resulted in "increased activity levels" and "increased function and decreased pain," demonstrated that Claimant was capable of performing full-time light work as defined in the RFC.

1    For the above reasons, the Court finds that the ALJ erred by rejecting the opinions

2    of treating physician Grove and instead crediting the opinions of non-examining medical

3    expert Dr. Schmitter and the state agency medical reviewer Dr. Griffith.

4    **B.    The ALJ failed to provide clear and convincing reasons for rejecting**

5    **Claimant's pain and symptom testimony**

6    As noted, the ALJ stated that she found Claimant's "medically determinable

7    impairments could reasonably be expected to cause the alleged symptoms[,]" but

8    concluded that Claimant's "statements concerning the intensity, persistence and limiting

9    effects of these symptoms are not consistent with the medical evidence and other evidence

10    in the record for the reasons explained in this decision." (Doc. 11-10 at 18) If the ALJ

11    finds that a claimant is not malingering, and the claimant "provided objective medical

12    evidence of an underlying impairment which might reasonably produce the pain or other

13    symptoms alleged, the ALJ may 'reject the claimant's testimony about the severity of her

14    symptoms only by offering specific, clear and convincing reasons for doing so.'" *Brown-*

15    *Hunter v. Colvin*, 806 F.3d 487, 492-93 (9th Cir. 2015) (quoting *Lingenfelter v. Astrue*, 504

16    F.3d 1028, 1036 (9th Cir. 2007)). "The clear and convincing standard is the most

17    demanding required in Social Security cases." *Moore v. Comm'r of Soc. Sec. Admin.*, 278

18    F.3d 920, 924 (9th Cir. 2002). This standard is not met by the ALJ "simply stat[ing] her

19    non-credibility conclusion and then summariz[ing] the medical evidence." *Brown-Hunter*,

20    806 F.3d at 494. Instead, an ALJ must identify which testimony he considers not credible,

21    and "link that testimony to the particular parts of the record supporting [his] non-credibility

22    determination." *Id.* The ALJ's opinion "must be sufficiently specific to allow a reviewing

23    court to conclude the adjudicator rejected the claimant's testimony on permissible grounds

24    and did not arbitrarily discredit a claimant's testimony regarding pain." *Bunnell v.*

25    *Sullivan*, 947 F.2d 341, 345-46 (9th Cir. 1991) (internal quotations and citations omitted).

26    The ALJ recognized in her unfavorable decision that Claimant testified he was not

27    able to maintain work because he could not "keep a schedule due to pain in his back, neck,

28    and elbow." (Doc. 11-10 at 18) The ALJ stated that "[a]lthough treatment records

frequently note signs such as positive straight leg raise tests, positive Spurling's maneuvers, and tenderness of the lumbar and cervical spine with a reduced range of motion," Claimant also "presented with normal sensation and full or nearly full strength in the upper and lower extremities." (Doc. 11-10 at 18)

Similarly, the ALJ contrasted documentation of Claimant's "slow, shuffling gait" and sometimes "stiff and stooped posture" with Claimant's ability to walk without an assistive device and the absence of the need for a back or neck brace. (*Id.* at 18-19) The ALJ noted that Claimant reported he could walk around the block "even on days of worsened symptoms." (*Id.* at 19, citing Doc. 11-7 at 20) The ALJ concluded that Claimant's "largely normal strength and sensation and his ability to walk without the use of an assistive device suggest a somewhat intact ability to stand and walk." (*Id.*) Further, the ALJ concluded that Claimant's response to treatment suggested that Claimant's degenerative disc disease was not "entirely disabling." (*Id.*) The ALJ cited Claimant's reports that his medication regimen had been effective at reducing his pain, that Claimant underwent a minimally-invasive microdiscectomy that "resulted in some symptom improvement," and that Claimant had been treated with epidural steroid injections that also reduced his pain "to some degree." (*Id.*) The ALJ found it significant the "record shows that with continued treatment and medication management, the claimant often rated his pain level as a three or four at his pain management appointments." (*Id.*) Moreover, the ALJ indicated that Claimant had been "apparently digging trenches at work shortly after his alleged onset date . . .[2]; while this increased his pain, his ability to do it at all suggests greater functioning than he has alleged." (*Id.*) Regarding epicondylosis of Claimant's left elbow, the ALJ found that because of successful treatment, this diagnosis did not cause "profound limitations." (*Id.*)

---

[2] During a March 4, 2011, office visit at Dr. Grove's practice, Claimant reported an increase in his lumbar and left cervical spine that had been increasing gradually over the previous two weeks that Claimant attributed to "increased activity at work digging trenches." (Doc. 11-8 at 38) Claimant's alleged onset date was February 24, 2011. Thus, the record does not specify whether Claimant's activity digging trenches occurred shortly before or shortly after Claimant's alleged onset date of disability.

The ALJ, however, did not explain why evidence of Claimant's largely normal strength and sensation, his ability to walk around the block, walk without an assistive device, or that medical treatment had some positive effect indicates that Claimant's testimony that variations in the degree of pain symptoms prevented him from maintaining employment was less credible.  This evidence, without explanation of how it refutes Claimant's pain symptom testimony, is not clear and convincing.

While the ALJ highlighted that Claimant "often rated his pain level as a three or four at his pain management appointments," this is a distortion of the record.  Over the span of his appointments with Dr. Grove's practice, Claimant reported a current pain level of 3 or 4 at less than 30% of his visits, while he reported a current pain level between 5 and 8 at more than 70% of his visits.  (Doc. 11-8 at 35-196, Doc. 11-9 at 26-45)  More importantly, Claimant's reported maximum pain levels ranged between values of 7 and 10, with an average value during the February 2011 to May 2015 period of 8.3.  (*Id.*)  The ALJ did not address this consistent evidence of Claimant's periods of severe pain.  Dr. Grove's practice noted in July 2011 that initial epidural steroid injections had provided Claimant significant relief, which the AL cited (Doc. 11-10 at 19), but also documented that Claimant's "pain [was] more severe randomly throughout the day and/or night[,]" an observation the ALJ ignored.  (Doc. 11-8 at 51)  Given Claimant's testimony of the frequency of his "bad" days and the VE's testimony that such a rate of absenteeism would exclude any work, the ALJ's failure to address this testimony is not harmless error.

The Court finds the ALJ erred by failing to provide specific, clear and convincing reasons supported by substantial evidence for rejecting Claimant's testimony about his pain symptoms and his degree of limitation.

VII.   **CONCLUSION**

For the reasons discussed above, the Court holds the ALJ erred by rejecting Dr. Grove's medical opinions and Claimant's symptom testimony. Given that the ALJ's RFC determination was based on these errors, the Court cannot deem the errors harmless.

## VIII.  REMAND

The ALJ erred in his consideration of Dr. Grove's opinions and Claimant's testimony.  Claimant urges the Court to remand for payment of benefits or, alternatively, for additional proceedings.  (Doc. 15 at 27-28)  The Commissioner asks the Court to affirm the Commissioner's final decision or, alternatively, to remand for further proceedings if it finds the ALJ committed harmful error.  (Doc. 16 at 17-18)

"When the ALJ denies benefits and the Court finds error, the Court ordinarily must remand to the agency for further proceedings before directing an award of benefits." *Leon v. Berryhill*, 880 F.3d 1041, 1045 (9th Cir. 2017).  Under a "rare exception" to this rule, the Court may remand for an immediate award of benefits after conducting a three-part inquiry:

> First, [the Court asks] whether the ALJ failed to provide legally sufficient reasons for rejecting evidence, whether claimant testimony or medical opinion.  Next, [the Court determines] whether there are outstanding issues that must be resolved before a disability determination can be made, . . . and whether further administrative proceedings would be useful.  When these first two conditions are satisfied, [the Court will] then credit the discredited testimony as true for the purpose of determining whether, on the record taken as a whole, there is no doubt as to disability.

*Id.* (internal quotation marks and citations omitted).  *Leon* emphasized that the Court has discretion to remand for further proceedings even if it reaches the third step in the process.  *Id.*  "Where an ALJ makes a legal error, but the record is uncertain and ambiguous, the proper approach is to remand the case to the agency."  *Id.* (quotation marks omitted).

As discussed, during the hearing the Claimant's counsel asked the VE whether an individual who, among other limitations, could stand and/or walk less than 2 hours and sit less than 2 hours in an 8-hour workday.  (Doc. 11-3 at 79)  The VE answered that there would be no work for that individual.  (*Id.*)  Claimant's counsel also asked the VE whether an individual who on average of 2 to 3 days a week during cooler weather and 1 to 2 days during hotter weather would "have increased problems concentrating and would be off task up to 33% of the day . . .  would be able to do any work on a sustained basis?"  (*Id.*

at 80)  The VE again answered that there would be no work for such an individual.  (*Id.*) If credited as true, Dr. Grove's opinions and Claimant's testimony would require the ALJ to enter an award of benefits.

The Court's independent evaluation of the record as a whole does not reveal any substantial grounds for doubting that Claimant is disabled.  The Court concludes that remand for an award of benefits is the appropriate remedy in this case.

Accordingly,

**IT IS ORDERED** that the final decision of the Commissioner of Social Security is vacated and this case is remanded for an award of benefits, with a finding of disability beginning February 24, 2011.

**IT IS FURTHER ORDERED** that the Clerk of Court shall enter judgment.

Dated this 9th day of June, 2020.

_____
Honorable Deborah M. Fine
United States Magistrate Judge